EARL HAVENS, Plaintiff-Appellant, v. JOSEPH E. MILLER et al., Defendants-Appellees.—EARL HAVENS, Plaintiff-Appellant, v. A. RUDOLF STEINER et al., Defendants-Appellees.—EARL HAVENS, Plaintiff-Appellant, v. JOHN F. FLANAGAN et al., Defendants-Appellees.—EARL HAVENS, Plaintiff-Appellant, v. PAUL S. BRAUN et al., Defendants-Appellees.

First District (5th Division)    Nos. 81-2464 through 81-2467 cons.

Opinion filed December 11, 1981.

Andrew M. Raucci, of Chicago, for appellant.

John H. Doeringer, of Chicago, for appellees Joseph E. Miller and A. Rudolph Steiner.

Terrence M. Barnicle, of Klein, Thorpe and Jenkins, Ltd., of Chicago, for appellee Electoral Board for Homewood-Flossmoor High School District 233.

Anthony G. Scariano, of Anthony Scariano & Associates, P. C., of Chicago Heights, for appellee Paul S. Braun.

JUSTICE LORENZ delivered the opinion of the court:

These election cases (Nos. 81-2464 through 67) concern the effects of failing to comply with the requirements of section 2 of article 13 of the 1970 Illinois Constitution and of section 10—4 of the Election Code. (Ill. Rev. Stat. 1979, ch. 46, par. 10—4.) Because of alleged noncompliance with these provisions, Appellant Earl Havens filed objections to the nomination petitions which Joseph E. Miller, A. Rudolf Steiner, John F. Flanagan, and Paul S. Braun filed to qualify for positions on the ballot of

the November 3, 1981, election as candidates for the board of Home-wood-Flossmoor School District 233. The Educational Officers Electoral Board overruled the objections, and the circuit court denied appellant's petitions for judicial review.

On October 23, 1981, after an expedited appeal of these rulings, we reversed the judgments of the circuit court and the decisions of the electoral board, and we ordered these candidates removed from the ballot.

This consolidated opinion explains our rulings on the following issues:

(1) Whether we have jurisdiction to hear these appeals;

(2) Whether the electoral board had "jurisdiction" to hear appellant's objections;

(3) Whether section 2 of article 13 of the 1970 Illinois Constitution mandates that candidates are ineligible for office if they fail to timely file a statement of economic interests;

(4) Whether section 10—4 of the Election Code mandates that a candidate's nomination petition is invalid if the circulator's affidavit on each sheet fails to comply with the requirements imposed by that statute; and

(5) Whether it would be unconstitutional to remove these candidates from the ballot.

Before stating the material facts, it is necessary to briefly explain the applicable candidacy requirements. To be eligible for the office of school board member, the candidates were required to file verified statements of economic interests. (Ill. Const. 1970, art. 13, §2; Ill. Rev. Stat. 1979, ch. 127, par. 604A—101(g).) These statements had to be filed with the county clerk (Ill. Rev. Stat. 1979, ch. 127, par. 604A—106) no later than the end of the period for filing nomination papers. (Ill. Rev. Stat. 1979, ch. 127, par. 604A—105(a).) The Constitution expressly provides that "Failure to file a statement within the time prescribed shall result in ineligibility for, or forfeiture of, office." Ill. Const. 1970, art. 13, §2.

In addition, section 10—4 of the Election Code requires that each sheet of a nomination petition include a sworn statement from the person who circulated the sheet. This affidavit must include (1) the circulator's residence address and (2) a certification that the circulator believes that the people who signed the petition were registered voters of the applicable district who gave their correct residence addresses. Section 10—4 expressly provides that "No signature shall be valid or be counted in considering the validity or sufficiency of [a nomination] petition unless the requirements of this Section are complied with." Ill. Rev. Stat. 1979, ch. 46, par. 10—4.

Three of the candidates (Miller, Steiner and Flanagan) filed their statements of economic interests with the secretary of the school board

rather than with the county clerk. It was not until two days after the filing deadline expired that the secretary forwarded these statements to the county clerk. (Braun's statement of economic interests was timely filed with the county clerk.)

Despite the requirements of section 10—4, the circulator's affidavit on each sheet of the nomination petitions filed by Braun, Miller and Steiner failed to include (1) the circulator's residence address and (2) a certification that the circulator believed that the people who signed the petitions were registered voters of the school district who gave their correct residence addresses.

Apparently each of the candidates obtained their petition sheets from the secretary of the school board. However, on the sheets submitted by Flanagan, all the information required by section 10—4 (except the residence address of the circulator) has been typed in at the end of the affidavits. And, because both Flanagan and Braun circulated their own petitions, the residence addresses of each of these candidates is included at the top of each sheet of their petitions.

Appellant's objections sought to have the candidates removed from the ballot on the grounds that they were either ineligible for office or that their nomination petitions were invalid. Nevertheless, the electoral board found that there was "substantial compliance" with the disputed provisions, and it overruled the objections.

OPINION

I

The electoral board contends that we have no jurisdiction to hear these appeals because the statute which provides for circuit court review of electoral board decisions (Ill. Rev. Stat. 1979, ch. 46, par. 10—10.1) does not mention appellate review. Accord, *Lawrence v. Board of Election Commissioners* (1977), 45 Ill. App. 3d 776, 360 N.E.2d 168; *Petterson v. Scoville* (1980), 83 Ill. App. 3d 746, 404 N.E.2d 795; contra, *Gilbert v. Municipal Officers' Electoral Board* (1981), 97 Ill. App. 3d 847, 423 N.E.2d 952.

The 1870 Illinois Constitution provided that Illinois appellate courts had jurisdiction to hear "such appeals and writs of error as the general assembly may provide * * *." (art. 6, §11.) See, *e.g.*, article 8 of the Civil Practice Act as it existed before the judicial article of the 1870 Constitution was amended. Ill. Rev. Stat. 1963, ch. 110, pars. 74-82.

But, under both the 1964 amendment to the judicial article of the 1870 Constitution (art. 6, §7, as amended) and the 1970 Constitution (art. 6, §6), there is a constitutional right of appeal to the appellate court from all "final judgments" of the circuit court, except where direct appeal to the

supreme court is provided or the judgment is an acquittal in a criminal case.

■■ The electoral board does not argue that the rulings of the circuit court (denying appellant's petitions for judicial review) were not "final judgments" in those proceedings. Because our jurisdiction to hear appeals from final judgments of the circuit court is granted by the Constitution, it is of no consequence that the applicable statute does not provide for appellate review.

## II

Candidate Braun contends that the electoral board lacked "jurisdiction" to hear appellant's objections because of alleged failure to comply with the statutory requirements for giving notice of the objections and for scheduling a hearing.

Section 10—10 of the Election Code states that "The day of the meeting [to consider the objections] shall not be less than 3 nor more than 5 days after the receipt of the * * * objector's petition by the chairman of the electoral board." Ill. Rev. Stat. 1979, ch. 46, par. 10—10.

The hearing on appellant's objections was held on September 8, 1981, but the chairman of the electoral board received the objections on September 1. Thus Braun contends that the hearing was not timely, and that the board lost its authority to act. We disagree.

According to section 1.11 of the Statute on Construction of Statutes (Ill. Rev. Stat. 1979, ch. 1, par. 1012),

> "The time within which any act provided by law is to be done shall be computed by excluding the first day and including the last, unless the last day is Saturday or Sunday or is a holiday as defined or fixed in any statute now or hereafter in force in this State, and then it shall also be excluded. If the day succeeding such Saturday, Sunday or holiday is also a holiday or a Saturday or Sunday then such succeeding day shall also be excluded."

■■ Even if our computation includes the day the objections were received by the Chairman—Monday, September 1—the last day for holding a hearing was Saturday, September 5. Furthermore, Monday, September 7, 1981, was Labor Day, a legal holiday. (Ill. Rev. Stat. 1979, ch. 98, par. 18.) Excluding the preceding Saturday, Sunday, and Monday, the hearing on September 8 was timely.

Braun also argues that the secretary of the school board, the official who first received the objections, failed to mail the objections to the appropriate people within 24 hours as required by section 10—8 of the Election Code. (Ill. Rev. Stat. 1979, ch. 46, par. 10—8.) The secretary testified that she received the objections on Saturday, August 29, at about

3:45 p.m., but she did not mail the documents until Monday, August 31, at 3:35 p.m.—almost 48 hours later.

■■ Even though the 24-hour period expired on a Sunday, Braun contends that the statute on construction of statutes does not apply to exclude that day from our computation of time. According to this argument, section 1.11 does not apply because the legislature used the phrase "24 hours" rather than the word "day." But section 1.11 concerns computations of "The time within which any act provided by law is to be done," and applicability of that provision does not depend upon the particular unit of time which was used in the law that requires the act in question.

Moreover, the fact that the legislature used the phrase "24 hours" instead of the word "day" does not show that the intent of the legislature was to preclude operation of section 1.11. At common law, "day" is defined as an indivisible unit of time which runs from one midnight to the next midnight. (*Cummins v. Holmes* (1882), 11 Ill. App. 158, 161-62; *Rock Finance Co. v. Central National Bank* (1950), 339 Ill. App. 319, 325, 89 N.E.2d 828.) So, under the common law definition of "day," the period of time which runs from 3:45 p.m. to 3:45 p.m. *of the next day* is not just a single "day," even though it is 24 hours. By using the phrase "within 24 hours," the legislature indicated that it wanted to avoid the common law definition of "day." But this does not indicate that the statute on statutes is inapplicable.

■■ Because the time period for sending out the required notices expired on a Sunday, we conclude that this day must be completely excluded in computing the timeliness of the mailing. Therefore we conclude that the secretary of the school board complied with the requirements of section 10—8.

The remaining argument on this issue is that the electoral board lacked "jurisdiction" because the chairman failed to have notice of the hearing served upon the candidates by the sheriff.

Section 10—10 provides that, within 24 hours of when an objector's petition is received by the chairman of the electoral board, the chairman "shall" send notice of the hearing to the candidate by registered or certified mail, and "shall" also have the sheriff serve a copy of the notice on the candidate.

In the present case, the chairman sent the required notices by registered or certified mail, but did not comply with the redundant requirement of also having the notices served by the sheriff. Emphasizing the use of the word "shall" in section 10—10, Braun argues that this provision is mandatory and that the chairman's noncompliance is a fatal flaw which nullified the authority of the electoral board to rule on the objections.

"A mandatory provision in a statute is one the omission to follow which renders the proceeding to which it relates illegal and void,

while a directory provision is one the observance of which is not necessary to the validity of the proceeding. * * * No universal rule can be given to distinguish between directory and mandatory provisions. The controlling question in this as in all other rules of construction is, what was the intention of the legislature?" *People ex rel. Agnew v. Graham* (1915), 267 Ill. 426, 436, 108 N.E. 699.

■■ However, "Substantial and not literal compliance with technical requirements of election laws seems to be a general rule. In the absence of fraud or express statutory language,* irregularities in the conduct of elections will not invalidate such elections." 3 Sutherland, Statutory Construction §70.01, at 296 n.13 (4th ed. 1974).

The question presented by Braun's argument is whether the General Assembly intended noncompliance with the redundant requirement of sheriff's service to be a fatal flaw. Obviously the provision for using two methods of serving notice was meant to increase the likelihood that candidates would actually receive notice of the hearing. And Braun, who participated in the hearing through his attorney, does not contend that he did not receive the notice that was sent by mail. So, in effect, he is arguing that the Electoral Board lacked authority to hear the objections to his nomination petition because he did not receive, by the hand of the sheriff, an identical copy of the notice of hearing which he had already received from his mailman.

■■ If we were to accept Braun's argument, it would mean that the chairmen of the various electoral boards would have absolute veto power over objections. By ignoring one of the alternative methods of serving notice, a chairman could prevent the board from having authority to sustain valid objections. But section 10—10 does not explicitly specify that this is the intended result of failure to send notice by both methods, and we simply do not believe that the legislature intended for such a defect to have the result of nullifying the board's authority. Since Braun presumably received notice of the hearing through one of the alternative methods of service, we conclude that the failure to send him an identical copy of the notice by the other method is not a fatal flaw.

### III

As we already noted, the key to determining whether a provision is mandatory or directory is to ascertain the intent of the legislature or the body politic which enacted the law. (*People ex rel. Agnew v. Graham* (1915), 267 Ill. 426, 436, 108 N.E. 699.) Of course, the first place to look for the intent of a constitutional or statutory provision is in the language of the law itself.

---

* See, *e.g.*, our discussion of section 2 of article 13 of the 1970 Illinois Constitution, and section 10—4 of the Election Code, in part III of our opinion.

"Whether a mandatory or directory construction should be given to a statutory provision may often be determined by an expression in the statute of the result that shall follow noncompliance with the provision.

\* \* \*

Of course, if a statute prescribes in terms that acts or proceedings shall be void if they are not done in the manner set out in the statute, the statutory prescription is obviously mandatory." 2A Sutherland, Statutory Construction §57.08, at 423 (4th ed. 1973).

For example, in a case which involved the validity of an election, the supreme court stated:

"Where a statute imposes duties upon officials connected with the holding of an election and by express language provides that the omission to perform the same shall render the election void, then all courts are bound to enforce such statute and pronounce the election void, regardless of all considerations touching its policy or impolicy \* \* \*." *People ex rel. Cant v. Crossley* (1913), 261 Ill. 78, 102, 103 N.E. 537.

In the present case, we are dealing with laws which explicitly specify the effect of noncompliance. Section 2 of article 13 of the 1970 Constitution expressly mandates that "Failure to file a statement within the time prescribed shall result in ineligibility for, or forfeiture of, office." And section 10—4 of the Election Code expressly mandates that "No signature shall be valid or be counted in considering the validity or sufficiency of [a nomination] petition unless the requirements of this Section are complied with." Ill. Rev. Stat. 1979, ch. 46, par. 10—4.

These provisions leave no room for discretion in determining the intended results of noncompliance; they are obviously mandatory laws.

It is argued that we would be "hyper-technical" if we enforced these provisions by ordering these candidates removed from the ballot, but we lack authority to disregard clear and unambiguous constitutional and statutory provisions.

Since these laws are mandatory, appellant did not have the burden of alleging or proving that the petitions were forgeries or that the noncompliance resulted in election fraud. Imposing such a burden on appellant would convert these provisions into merely directory laws. Furthermore, appellant's motive in filing the objections is irrelevant to the determination of whether the candidates failed to comply with these mandatory election laws. It is likewise irrelevant that sustaining the objections would leave only three candidates running for three seats, or even whether it would leave no candidates on the ballot at all.

Both Braun and the electoral board argue that the findings of the electoral board should be sustained as "not against the manifest weight of

the evidence." As an appellate court, we take a deferential approach to the findings made below on disputed factual issues; but the scope of our review on questions of law is independent, not deferential. (Compare Supreme Court Rule 366(b)(1)(i) (Ill. Rev. Stat. 1979, ch. 110A, par. 366(b)(1)(i)) with Rule 366(b)(1)(ii) (Ill. Rev. Stat. 1979, ch. 110A, par. 366(b)(1)(ii).) Moreover, the facts which we find controlling are not disputed, and, in this case, the legal result of these undisputed facts is solely a question of law.

We recognize that in *Merz v. Volberding* (1981), 94 Ill. App. 3d 1111, 419 N.E.2d 628, the appellate court excused compliance with a mandatory provision of the Election Code, but we find that *Merz* is inapplicable to the present case. The statute involved in that case was ambiguous and unclear. And, as the court pointed out, "[I]t would be a great injustice to penalize any candidate for failure to understand a provision in the Election Code which we ourselves have had considerable difficulty in interpreting." (94 Ill. App. 3d 1111, 1117.) The court emphasized, however, that in the future it would insist on strict compliance. (94 Ill. App. 3d 1111, 1118.) So, in essence, the statute in *Merz* was too vague to be mandatorily enforced until its meaning was ascertained through the process of statutory construction and authoritatively expressed by the court. Thus the holding in *Merz* was clearly based upon the same considerations of "reasonable notice" as the due process void-for-vagueness doctrine.

In contrast with *Merz*, the laws involved in the present case are clear and unambiguous; they do not need "construction" before being enforced as intended.

The electoral board argues that filing statements of economic interests with the secretary of the school board, rather than with the county clerk, was a "technical violation" which "caused no harm to the public." The electoral board also states that these statements were available for public inspection at the office of the school board. However, the Governmental Ethics Act informed the public that the statements would be available for inspection at the office of the county clerk. (Ill. Rev. Stat. 1979, ch. 127, par. 604A—106.) Even if the statements were available for public inspection at the office of the school board, this would be of no value to members of the public who failed to discover that the candidates filed their statements somewhere other than where the law required these documents to be filed.

*Daniels v. Cavner* (1949), 404 Ill. 372, 88 N.E.2d 823, shows that submission of these documents to the secretary of the school board cannot be considered a valid filing. The candidates in *Daniels* attempted to file their nomination papers by presenting them to the city clerk—at his residence—around midnight of the last day for filing those documents

with that official. The supreme court held that this was not a valid filing, and the candidates were not permitted to appear on the ballot.

"The statute states that nominating papers shall be filed with the clerk, which direction has been construed to mean with the clerk at his official office and during usual business hours. To allow the clerk to accept nomination papers at any other time would be contrary to our election statute and give arbitrary power to the clerk not intended. The purpose of such a rule is obvious, for it is not only the clerk who is interested in the proper and timely filing of nomination petitions, but other candidates for office and citizens and voters in general have a vital interest in the question of a waiver or extension of time for the filing of nomination papers. Papers of such nature should be contained in the files and records of the clerk, subject at all times to the inspection of the whole public, both for their information and for their examination to see if objections may lie to their sufficiency. To allow filing at whatever place the clerk might be found would defeat such objects, and as previously pointed out \* \* \* [Citation], the practice of indiscriminate filing would only lead to confusion and possible fraud." 404 Ill. 372, 379-80.

■■ Based on *Daniels*, we conclude that Steiner, Flanagan and Miller failed to comply with the mandatory requirements of section 2 of article 13 of the 1970 Illinois Constitution. They are, therefore, ineligible for the office they sought, and the objections to their nomination papers should have been sustained.

It is also clear that the nomination petitions filed by Miller and Steiner fail to comply with the requirements of section 10—4. But according to Braun, his petitions sufficiently comply with the requirements of this law because.(a) his residence is listed at the top of each sheet; (b) the people who signed the petition state that they are voters who reside within the school district; and (c) each signer gave an address after his or her signature.

The problem with this argument is that the people who signed the petitions were not under oath. Section 10—4 requires the circulator—not the signers—to certify under oath that the required statements are true. The distinction is significant because the criminal perjury provision of the Election Code (Ill. Rev. Stat. 1979, ch. 46, par. 29—10) applies only to false statements "in any affidavit, certificate or sworn oral declaration required by any provision of [the] Code \* \* \*." Since the nomination petition itself is not an affidavit, certificate, or sworn oral declaration, it is obvious the requirement of a circulator's affidavit is one of the primary safeguards against fraudulent nomination petitions.

Braun refers us to *Lewis v. Dunne* (1976), 63 Ill. 2d 48, 344 N.E.2d

443, and *Madison v. Sims* (1972), 6 Ill. App. 3d 795, 286 N.E.2d 592, in support of his argument that we should consider the statements of the signers as sufficient to fulfill the requirements of the circulator's affidavit. We find, however, that these cases are inapplicable because they concern a directory provision; the applicable statute merely required that certain documents "shall be in *substantially* the following form." (Emphasis added.) Ill. Rev. Stat. 1971 and 1975, ch. 46, par. 7—10.

■■ Because Braun, as circulator, did not certify under oath that he believed that the signers gave their correct residence addresses, there was a complete failure to comply with this requirement of section 10—4.

■■ The electoral board contends that, in this case, the petition should be considered valid because the candidates used forms supplied by the secretary of the school board. However, the secretary's error in the execution of this ministerial act neither nullified the requirements of the applicable election statutes nor estopped appellant from objecting to invalid petitions. See *Schumann v. Kumarich* (1981), 102 Ill. App. 3d 454.

We conclude that Miller, Steiner and Braun failed to comply with one or more of the mandatory requirements of section 10—4 of the Election Code. Therefore, each sheet of their nomination petitions is invalid, and appellant's objections should have been sustained.

IV

The electoral board argues that the applicable standard of constitutional review in this case is "strict scrutiny." Consequently, according to the board, appellant had the burden of showing (1) that there was a compelling reason for removing the candidates from the ballot, and (2) that this sanction was the least restrictive means available for furthering this compelling objective. In the alternative, the board argues that this sanction is a violation of the guarantee of due process of law (U.S. Const., amend. 14), even if subjected to the less rigorous "rational basis" test.

It is argued that strict scrutiny is required because removing these candidates from the ballot would allegedly violate fundamental constitutional rights of voters and candidates. However, these filing and affidavit requirements can be easily complied with by candidates of every political persuasion, race, sex, religion, or degree of wealth. In effect, the board is contending that voters have a fundamental right to vote for these particular candidates, and that these candidates have a fundamental right of access to the ballot despite their failure to comply with reasonable candidacy requirements. But in *Bullock v. Carter* (1972), 405 U.S. 134, 143, 31 L. Ed. 2d 92, 99, 92 S. Ct. 849, 856, the United States Supreme Court stated that "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review."

Moreover, the existence of barriers to candidacy does not automatically trigger strict scrutiny. 405 U.S. 134, 143, 31 L. Ed. 2d 92, 100, 92 S. Ct. 849, 856.

Rather than opting for an approach that candidacy restrictions are always tested by either the "strict scrutiny" or the "rational basis" tests, the court showed that the appropriate standard of constitutional review in such cases is determined by a realistic examination of the nature and impact of the restrictions upon voters. (405 U.S. 134, 143-44, 31 L. Ed. 2d 92, 100, 92 S. Ct. 849, 856.) For example, "strict scrutiny" was required in *Bullock* because the excessive filing fees required by the Texas election laws had a "real and appreciable impact" upon candidates and voters who were not wealthy. (405 U.S. 134, 144, 31 L. Ed. 2d 92, 100, 92 S. Ct. 849, 856.) See also *Trafelet v. Thompson* (7th Cir. 1979), 594 F.2d 623, 631-32, *cert. denied* (1979), 444 U.S. 906, 62 L. Ed. 2d 142, 100 S. Ct. 219 (rejecting the argument that the State must prove a compelling interest to justify depriving voters of the opportunity to vote for judges who were forced to retire); *Richards v. LaVelle* (7th Cir. 1980), 620 F.2d 144; and *Anderson v. Schneider* (1977), 67 Ill. 2d 165, 365 N.E.2d 900.

Realistically examined, we cannot conclude that the candidacy requirements involved in this case would have an appreciable impact upon the fundamental rights of individuals to associate for political purposes and to support candidates who represent their political beliefs. (See, generally *Developments in the Law-Elections*, 88 Harv. L. Rev. 1111, 1217-19 (1975).) Of course, there will always be an occasional candidate who will fail to comply with even the simplest requirements. (See, *e.g.*, *Richards v. LaVelle* (7th Cir. 1980), 620 F.2d 144, 147 (to comply with a particular candidacy requirement, "All the candidate had to do was count").) But the fact that there will inevitably be such cases does not, by itself, call for strict scrutiny.

■■ We conclude that the "rational basis" test is applicable to the present case. Using this less rigorous standard of constitutional review, the crucial question is whether it is conceivable that removing these candidates from the ballot has a rational relationship to a legitimate governmental objective.

Relying on *Richards v. LaVelle*, the electoral board contends that, even under the less rigorous standard of review, removing these candidates from the ballot would constitute a violation of the right to due process of law. In *Richards*, a board of election commissioners sought to keep a candidate off the ballot because his nomination petition had more than the maximum number of signatures. But the only governmental interest which was conceivably furthered by this limitation was the bureaucratic interest in not having to cope with petitions which had too many signatures. And the court held that the sanction of keeping the

candidate off the ballot was unconstitutional because it was not a rational way of furthering this governmental interest.

In the present case, however, the disputed laws are clearly designed to protect the integrity of the electoral process itself rather than some bureaucratic interest in not having to cope with bulky petitions. It is conceivable that the sanctions imposed for noncompliance with section 2 of article 13 of the 1970 Constitution, and section 10—4 of the Election Code, will further the State's valid interest in protecting the integrity of the electoral process by helping to insure that candidates will strictly comply with the requirements of these election laws. Thus we cannot conclude that the sanction of removing these candidates from the ballot is not rationally related to this legitimate State interest. We therefore hold that removing these candidates from the ballot will not deprive them of their right to due process of law.

Based on the preceding reasons, we reversed both the judgments of the circuit court and the decisions of the electoral board, and we ordered these candidates removed from the ballot for the November 3, 1981, election.

Circuit court and electoral board reversed with directions entered by order of October 23, 1981.

MEJDA and WILSON, JJ., concur.