FIFTH DIVISION

OCTOBER 25, 2002

MICHAEL H. PREUTER, MARIANNE KING ) APPEAL FROM THE

and RONALD J. LUNDIN, ) CIRCUIT COURT OF

Objectors-Appellants. ) COOK COUNTY.

)

v. )

)

STATE OFFICERS ELECTORAL BOARD, )

and STATE BOARD OF ELECTIONS FOR ) No. 1-02-2545

THE STATE OF ILLINOIS, ELAINE ROUPAS, )

WANDA REDNOUR, DAVID MURRAY, JOHN )

KEITH, PHILIP O'CONNOR, WILLIAM )

McGUFFAGE, JESSE SMART, ALBERT PORTER, )

Members, RONALD D. MICHAELSON, Executive )

Director, and CHANDLER HADRABA, STEVE ) HONORABLE

DUBOVIK and JOHN TEPLEY, Candidates, ) MARCIA MARAS,

Defendants-Appellees. ) JUDGE PRESIDING.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Objectors Michael H. Preuter, Marianne King and Ronald J. Lundin appeal an order of the circuit court of Cook County reversing decisions of the State Board of Elections for the State of Illinois (Board), sitting as the State Officers Electoral Board (SOEB),
(footnote: 1) sustaining objections to the candidacies of Chandler Hadraba, Steve Dubovik and John Tepley (Candidates) for State Repre­sentative from the 48th, 95th and 41st Representative Districts, respectively.  This court granted the Objectors' motion to accelerate the appeal.
(footnote: 2)  For the reasons which follow, we affirm the circuit court.

The background of this appeal, as disclosed by the record and relevant statutory law, is as follows.  In the general election held in 2000, Elizabeth Quaintance, a Libertarian candidate, received over 26 percent of the vote for State Representative in the 39th Representative District.  Section 10-2 of the Election Act provides in relevant part as follows: 

"The term 'political party', as hereinafter used in this Article 10, shall mean any 'established political party', as hereinafter defined and shall also mean any political group which shall hereafter under­take to form an established political party in the manner provided for in this Article 10 ***.

A political party which, at the last general election for State and county officers, polled for its candidate for Governor more than 5% of the entire vote cast for Governor, is hereby declared to be an 'established political party' as to the State and as to any district or political subdivision thereof.

A political party which, at the last election in any congres­sional district, legislative district, county, township, municipality or other political subdivision or district in the State, polled more than 5% of the entire vote cast within such territorial area or political subdivision, as the case may be, has voted as a unit for the election of officers to serve the respective territorial area of such district or political subdivision, is hereby declared to be an 'established political party' within the meaning of this Article as to such district or political subdivision.

Any group of persons hereafter desiring to form a new polit­ical party throughout the State, or in any congressional, legis­lative or judicial district, or in any other district or in any political subdivision (other than a municipality) not entirely within a single county, shall file with the State Board of Elections a petition, as hereinafter provided;  and any such group of persons hereafter desiring to form a new political party within any county shall file such petition with the county clerk;  and any such group of persons hereafter desiring to form a new political party within any munici­pality or township or within any district of a unit of local govern­ment other than a county shall file such petition with the local elec­tion official or Board of Election Commissioners of such munici­pal­ity, township or other unit of local government, as the case may be.  Any such petition for the formation of a new political party through­out the State, or in any such district or political subdivision, as the case may be, shall declare as concisely as may be the intention of the signers thereof to form such new political party in the State, or in such district or political subdivision;  shall state in not more than 5 words the name of such new political party; shall at the time of filing contain a complete list of candidates of such party for all offices to be filled in the State, or such district or political subdivision as the case may be, at the next ensuing election then to be held;  and, if such new political party shall be formed for the entire State, shall be signed by 1% of the number of voters who voted at the next preceding Statewide general election or 25,000 qualified voters, whichever is less.  If such new political party shall be formed for any district or political subdivision less than the entire State, such petition shall be signed by qualified voters equaling in number not less than 5% of the number of voters who voted at the next preceding regular election in such district or political sub­division in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area.  However, whenever the minimum signature requirement for a district or political subdivision new political party petition shall exceed the minimum number of signatures for State-wide new political party petitions at the next preceding State-wide general election, such State-wide petition signature requirement shall be the minimum for such district or political subdivision new political party petition.

For the first election following a redistricting of congres­sion­al districts, a petition to form a new political party in a congres­sional district shall be signed by at least 5,000 qualified voters of the congressional district.  For the first election following a redis­trict­ing of legislative districts, a petition to form a new political party in a legislative district shall be signed by at least 3,000 qualified voters of the legislative district.  For the first election following a redistricting of representative districts, a petition to form a new political party in a representative district shall be signed by at least 1,500 qualified voters of the representative district.

***

The filing of such petition shall constitute the political group a new political party, for the purpose only of placing upon the ballot at such next ensuing election such list or an adjusted list in accordance with Section 10-11, of party candidates for offices to be voted for throughout the State, or for offices to be voted for in such district or political subdivision less than the State, as the case may be, under the name of and as the candidates of such new political party.

If, at such ensuing election, the new political party's candi­date for Governor shall receive more than 5% of the entire votes cast for Governor, then such new political party shall become an 'established political party' as to the State and as to every district or political subdivision thereof.  If, at such ensuing election, the other candidates of the new political party, or any other candidate or candidates of the new political party shall receive more than 5% of all the votes cast for the office or offices for which they were candi­dates at such election, in the State, or in any district or political sub­division, as the case may be, then and in that event, such new polit­ical party shall become an 'established political party' within the State or within such district or political subdivision less than the State, as the case may be, in which such candidate or candidates received more than 5% of the votes cast for the office or offices for which they were candidates.  It shall thereafter nominate its candi­dates for public offices to be filled in the State, or such district or political subdivision, as the case may be, under the provisions of the laws regulating the nomination of candidates of established political parties at primary elections and political party conventions, as now or hereafter in force.

A political party which continues to receive for its candidate for Governor more than 5% of the entire vote cast for Governor, shall remain an 'established political party' as to the State and as to every district or political subdivision thereof.  But if the political party's candidate for Governor fails to receive more than 5% of the entire vote cast for Governor, or if the political party does not nominate a candidate for Governor, the political party shall remain an 'established political party' within the State or within such district or political subdivision less than the State, as the case may be, only so long as, and only in those districts or political subdivisions in which, the candidates of that political party, or any candidate or candidates of that political party, continue to receive more than 5% of all the votes cast for the office or offices for which they were candidates at succeeding general or consolidated elections within the State or within any district or political subdivision, as the case may be.

Any such petition shall be filed at the same time and shall be subject to the same requirements and to the same provisions in respect to objections thereto and to any hearing or hearings upon such objections that are hereinafter in this Article 10 contained in regard to the nomination of any other candidate or candidates by petition ***."  10 ILCS 5/10-2 (West 2000).

Section 8-17 of the Election Code addresses the nomination procedures for various types of vacancies, stating in part as follows:

"The death of any candidate prior to, or on, the date of the primary shall not affect the canvass of the ballots.  If the result of such canvass discloses that such candidate, if he had lived, would have been nominated, such candidate shall be declared nominated.

In the event that a candidate of a party who has been nominated under the provisions of this Article shall die before election (whether death occurs prior to, or on, or after, the date of the primary) or decline the nomination or should the nomination for any other reason become vacant, the legislative or representative committee of such party for such district shall nominate a candidate of such party to fill such vacancy.  However, if there was no candi­date for the nomination of the party in the primary, no candidate of that party for that office may be listed on the ballot at the general election, unless the legislative or representative committee of the party nominates a candidate to fill the vacancy in nomination within 60 days after the date of the general primary election."  10 ILCS 5/8-17 (West 2000).

 In 2001, the Illinois legislative map was redistricted, placing parts of the former 39th Representative District in the new 41st, 42nd, 47th, 48th and 95th Representative Districts.

The Board issued a "State of Illinois Candidate's Guide 2002" (Guide).  The Preface to the Guide states that it lists the offices to be nominated or elected, filing dates, general requirements for filing, specific requirements for individual offices and answers to some of the more frequently asked questions about the nominating process, including signature requirements.  The Preface also states in part as follows:

"Legal interpretations contained in this guide, however, are not binding and should not be construed as sufficient argument in response to an objection to any candidate's nominating papers.  The State Board of Elections recommends that all prospective candi­dates consult with competent legal counsel when preparing their nominating papers."

The Guide's subsequent discussion of the requirements for the office of State Representative states in part as follows:

"
NOTE:
 The Libertarian Party received more than 5% of the votes cast at the November 2000 General Election in the 39th Representative District.  Accordingly, to the extent the boundaries of the 39th Representative District are changed by legislative redistricting, the State Board of Elections will consider the Liber­tarian Party to be an established party in any repre­sen­tative district which includes any portion of the former 39th Representative District until directed to the contrary by a court of competent jurisdiction."

The Guide's discussion of the requirements for the office of State Representative also states in part that established party candidates would be required to obtain the signatures of at least 300 primary electors of the candidate's party in the district, whereas new party candidates would be required to obtain the signatures of at least 1,500 qualified voters in the district, citing section 10-2 of the Election Code as the basis for the latter requirement.

No candidate ran for the Libertarian nomination for State Representative from the 41st, 48th and 95th Representative Districts in the general primary election held on March 19, 2002.  On May 20, 2002, the management committees for the Libertarian Party in these three districts each filed with the Board a "Resolution to Fill a Vacancy in Nomination," naming Tepley as the nominee for the 41st Representative District, Hadraba as the nominee for the 48th Representative District, and Dubovik as the nominee for the 95th Representative District.  

On May 28, 2002, Lundin, Preuter and King filed objections to the Libertarian candidacies; each alleged in relevant part that the Libertarian Party was not an established political party in their respective districts.  In each case, the objector moved for judgment on the pleadings, and the candidate moved to strike and dismiss the objection, all raising similar issues.  All three cases were considered by hearing officer Colleen Burke, who recommended that the motions for judgment on the pleadings be denied and that the motions to strike in dismiss be granted in part and denied in part.  Burke ruled that the objectors had standing to object, but ruled that the Board's determination as outlined in the Guide was correct and that the Libertarian Party should be considered an established political party in the 41st, 48th and 95th Representative Districts.

On July 15, 2002, the Board convened as the SOEB to consider the cases.  The Board's Chairman, after noting Burke's recommendation, also sought a recommendation from The Board's General Counsel, who agreed with Burke.  Members of the Board discussed the issue at length, some expressing the opinion that the statement in the Guide was not consistent with the Election Code or the Illinois Constitution.  The Board ultimately voted unanimously to sustain the objections, issuing written decisions to this effect the same day.

On July 22, 2002, the Candidates filed a Complaint for Expedited Judicial Review in the circuit court of Cook County.  On August 22, 2002, the circuit court entered an order reversing the decisions of the SOEB, and remanded the case with instructions to place the names of each candidate on the ballot for the November 5, 2002 General Election, for the reasons stated in open court.  The transcript shows that the circuit court ruled that the SOEB had misinterpreted section 10-2 of the Election Code and that the SOEB was estopped from barring the Libertarian Candidates in light of the specific statement on the issue in the Guide.  The Objectors then filed a timely Notice of Appeal to this court.  On September 19, 2002, this court granted the Objectors' motion to expedite the appeal and set an expedited briefing schedule, which was concluded on October 7, 2002.

Initially, this court addresses the procedural posture of the case, the jurisdiction of this court, and the standard of review.  Section 10-10.1 of the Election Code provides that an objector aggrieved by a decision of an electoral board may secure judicial review in the circuit court.  10 ILCS 5/10-10.1 (West 2000).  However, section 10-10.1 does not generally adopt the provisions of the Administrative Review Law; rather, the Administrative Review Law is expressly adopted only with respect to objectors or proponents aggrieved by decisions of an electoral board regarding a petition filed under section 18-120 of the Property Tax Code.  10 ILCS 5/10-10.1 (West 2000).  Thus, this case is not governed by the standards of the Administrative Review Law.  See 735 ILCS 5/3-102 (West 2000).  It follows that jurisdiction would not lie in this case under the Administrative Review Law.  See 735 ILCS 5/3-102, 3-112 (West 2000).  

Of course, common law methods of obtaining judicial review of final administrative decisions may be proper.  See, 
e.g.
, 
Smith v. Department of Public Aid
, 67 Ill. 2d 529, 541, 367 N.E.2d 1286, 1292 (1977).  The right to appeal from all final judgments, conferred by Article VI, section 6, of the Illinois Constitution, includes final judgments in cases where the trial court has reviewed a decision of an electoral board.  
Havens v. Miller
, 102 Ill. App. 3d 558, 429 N.E.2d 1292 (1981).  A common law writ of 
certiorari
 is a general method for obtaining judicial review of administrative actions when the law conferring power on the agency does not provide for another form of review.  
Hanrahan v. Williams
, 174 Ill. 2d 268, 272, 673 N.E.2d 251, 253 (1996).  The standards of review under a common law writ of 
certiorari
 are essentially the same as those under the Administrative Review Law.  
Hanrahan
, 174 Ill. 2d at 272, 673 N.E.2d at 253-54.

Accordingly, in examining the Board's factual findings, a reviewing court should not weigh the evidence or substitute its judgment; a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence.  See 
City of Belvidere v. Illinois State Labor Relations Bd.
, 181 Ill.2d 191, 205, 692 N.E.2d 295, 302 (1998).  The Board's ruling on a question of law, on the other hand, is reviewed on a 
de novo
 basis.  See 
City of Belvidere
, 181 Ill.2d at 205, 692 N.E.2d at 302.  A mixed question of fact and law is reviewed under the clearly erroneous standard.  See 
City of Belvidere
, 181 Ill.2d at 205, 692 N.E.2d at 302.  Apply­ing this last standard to mixed questions provided some deference to the experience and expertise of an administrative agency or board.  
City of Belvidere
, 181 Ill.2d at 205, 692 N.E.2d at 302.

The Objectors argue that the circuit court erred in rejecting the SOEB's interpretation of section 10-2 of the Election Code.  The parties treat the issue as one of pure statutory construc­tion.  The Objectors also argue that the trial court erred in reversing the SOEB's ruling that the Candidates were not entitled to rely on the Guide's statement regarding the status of the Liber­tarian Party in newly redrawn districts encompassing the former 39th Representative District.  The doctrine of estoppel is as applicable to questions of law as it is to questions of fact.  See 
Du Page Forklift Service, Inc. v. Material Handling Services, Inc.
, 195 Ill. 2d 71, 80, 744 N.E.2d 845, 850 (2001).  As there is no dispute regarding the underlying facts of each case, this court may review the issues 
de novo
.  However, this court need only address the second issue, as it disposes of the appeal.

In 
Merz v. Volberding
, 94 Ill. App. 3d 1111, 419 N.E.2d 628 (1981), objectors challenged the right of three independent candidates to appear on the ballot, claiming that the candidates' petitions did not contain the minimum number of signatures required by section 10-3 of the Election Code.  The local electoral board ruled that the candidates' petitions did meet the statutory signature requirement.  The objectors sought judicial review of the electoral board's ruling; the trial court affirmed the decision of the electoral board.  The objectors appealed.

 This court affirmed in part.  The record in 
Merz
 established that the city clerk in the past had issued information sheets which set forth the minimum and maximum signature requirements for candidates running for the offices of mayor, clerk, treasurer and alderman.  The 
Merz
 court analyzed section 10-3 of the Election Code, ruled that it was not clear and unambiguous, and that the 
objectors
 had correctly interpreted the statute.  
Merz
, 94 Ill. App. 3d at 1114, 419 N.E.2d at 630.  Accordingly, the information on the information sheets regarding the number of signatures was incorrect.  
Merz
, 94 Ill. App. 3d at 1117, 419 N.E.2d at 633.  Nevertheless, because the city clerk traditionally handed out such information sheets prior to elections and the practice had gone unchallenged for several years, this court ruled that reliance on such information was justified.  
Merz
, 94 Ill. App. 3d at 1117, 419 N.E.2d at 633.

This case involves the requirements imposed on new political parties for obtaining and retaining the status of an "established political party" under section 10-2 of the Election Code.  The Objectors argue that 
Merz
 is inapplicable in this context, as this court distinguished 
Merz
 in 
Foster v. Municipal Officers Electoral Bd.
, 113 Ill. App. 3d 721, 726, 447 N.E.2d 990, 993 (1983), on the ground that it involved section 10-3, not section 10-2.  However, 
Foster
 addressed a party that lost established status by failing to run candidates in the "last election in the territorial area of such district or political subdivision" under section 10-2.  In 
Foster
, there is no discussion of the estoppel issue addressed in 
Merz
.  There is no suggestion in 
Foster
 that the government provided the party or candidates with incorrect information.  Moreover, 
Foster
 does not involve the effect of decennial redistricting on parties that were previously established on a less than statewide basis under section 10-2 of the Election Code.  Accordingly, 
Foster
 is not controlling in this case.

In this case, as in 
Merz
, the first consideration is whether the statute at issue is clear and unambiguous.  A statute is ambiguous if it "is capable of being understood by reasonably well-informed persons in two or more different senses."  
People v. Jameson
, 162 Ill. 2d 282, 288, 642 N.E.2d 1207, 1210 (1994).  A statute may also contain a latent ambiguity.  
Stewart v. Industrial Commission
, 115 Ill. 2d 337, 340, 504 N.E.2d 84, 86 (1987).  A latent ambiguity arises "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings."  
Hoglund v. State Farm Mutual Automobile Ins. Co.
, 148 Ill. 2d 272, 279, 592 N.E.2d 1031, 1035 (1992), quoting Black's Law Dictionary 102 (3d ed. 1933).

In this case, in one paragraph alone, section 10-2 of the Election Code refers to a "political subdivision or district," a "territorial area or political subdivision," "the respective territorial area of such district or political subdivision," and ultimately again to a "district or political sub­division."  The Libertarian Party polled more than 5% in the 39th Representative District in the 2000 general election.  The question presented in this case was whether, having so voted as a unit to serve that territorial area and become an established political party as to such district or sub­division, the Libertarian Party lost its status when that territorial area of the 39th Representa­tive District was redistricted into numerous other districts.  The record shows that the Board's General Counsel and legal staff anticipated this exact question and specifically answered it in the negative in the 2002 Guide.  The record shows that the hearing officer in this case wrote that section 10-2 did not specifically address the question, but rejected an interpretation of section 10-2 under which the Libertarian Party would not be an established political party in 
any
 district following redistricting, which appears to be the argument adopted by the Objectors.  The hearing officer ultimately agreed with the interpretation of section 10-2 reflected in the guide, concluding that the Objectors' argument rendered other parts of section 10-2 meaningless.  The SOEB rejected the interpretation given by the General Counsel and the hearing officer as contrary to the statute.  On review, the circuit court agreed with the interpretation given in the guide.

Having reviewed the arguments presented in the record and in the briefs on appeal, we conclude that the Objectors, the Candidates, the SOEB, its staff, and the circuit court judge were all reasonably well-informed and that section 10-2 is capable of being understood by reasonably well-informed persons in two or more different senses, given the facts and circumstances presented here.  An argument based on section 10-2's requirements for new political parties following redistricting of representative districts begs the question of whether the Libertarian Party must be considered a new political party following such redistricting.  On the other hand, the Objectors correctly note that section 10-2 does not expressly state that political parties established on a less than statewide basis retain that status after redistricting, and if so, where it retains that status.  The interpretation given in the Guide appears to be based on the determination that, insofar as section 10-2 refers to "5% of the entire vote cast in such territorial area or political subdivision," the term "such territorial area" relates back to section 10-2's initial reference to "any congressional district, legislative district, county, township, municipality or other political subdivision or district in the State," thereby allowing the Libertarian Party to claim that it is established in the territorial area of the old 39th Representative District, even though the districts have since been redrawn, because redistricting did not wipe the territorial area at issue from the face of the earth..

Either interpretation of section 10-2 may lead to absurd results.  Had the statewide redistricting of representative districts created a new 39th Representative District with the exact boundaries of the previous 39th Representative District, minus one city block, the Objectors' argument would suggest that the Libertarian Party could nevertheless be disestablished in the 39th Representative District, because the redrawn district is technically new.  On the other hand, under that same scenario, the Candidates' interpretation of the statute establishes the Libertarian Party not only in the 39th Representative District, but also the district to which that one city block was allocated.  However, the fact that either interpretation may lead to absurd results does not change the fact that either interpretation may reasonably find support in the language of section 10-2.  Accordingly, this court must conclude that the statute is ambiguous in the context of this appeal.

It is undisputed that the Board issued a "State of Illinois Candidate's Guide 2002" that specifically addressed the issue on review in this case, stating as follows:

"
NOTE:
 The Libertarian Party received more than 5% of the votes cast at the November 2000 General Election in the 39th Representative District.  Accordingly, to the extent the boundaries of the 39th Representative District are changed by legislative redistricting, the State Board of Elections will consider the Libertarian Party to be an established party in any representative district which includes any portion of the former 39th Representative District until directed to the contrary by a court of competent jurisdiction."

The Objectors raise a number of arguments as to why the Candidates should not be allowed to rely on this language in the Guide.  We address each in turn.

The Objectors argue that the SOEB should not be estopped because invoking the doctrine would prevent the SOEB from correcting its mistakes and permit violations of the law to remain in perpetuity.  See, 
e.g.
, 
Halleck v. County of Cook
, 264 Ill. App. 3d 887, 894, 637 N.E.2d 1110, 1115 (1994).  The Objectors' concern is valid in general, but not persuasive in the context of this case.  The Election Code requires that a political party established on a less than statewide basis must continue to gain a given percentage of the vote to remain an established political party in a given district or other political subdivision.  Moreover, the Objectors have cited no authority precluding the Board or SOEB from informing people in future Guides that it is adopting a different interpretation of section 10-2 in future elections from that found in the 2002 Guide.

The Objectors correctly note that to invoke equitable estoppel against a public body, there generally must be an affirmative act on the part of the public body that induces substantial reliance, and that affirmative act generally must be an act of the public body itself such as a legislative enactment, rather than the unauthorized acts of a ministerial officer or a ministerial misinterpretation.  
E.g.
, 
Hamwi v. Zollar
, 299 Ill. App. 3d 1088, 1095, 702 N.E.2d 593, 598 (1998).  Accordingly, the Objectors argue that the Candidates' reliance on the Guide was not reasonable, particularly given the disclaimer set forth at the beginning of the Guide.  

The objectors in 
Merz
 made a similar argument regarding the information sheets distributed by the city clerk.  The 
Merz
 court rejected the argument, stating as follows:

"We find this argument unpersuasive.  Since the city clerk traditionally has handed out information sheets prior to elections and since the practice has gone unchallenged for several years, we do not find that reliance on such information was unjustified."  
Merz
, 94 Ill. App. 3d at 1117, 419 N.E.2d at 633.

In this case, the Guide was alleged to be issued under the Board's authority, and the Objectors did not dispute the allegation.  As the Objectors note, the transcript shows that some members of the Board were unaware that the language at issue was in the Guide.  Of course, the Candidates did not have the benefit of the transcript when they relied on the Guide.

Although the Guide includes a general disclaimer, it then proceeds to not only address the precise factual situation presented in these cases, but also states that the SOEB "
will
 consider the Libertarian Party to be an established party in any representative district which includes any portion of the former 39th Representative District 
until directed to the contrary by a court of competent jurisdiction.
"  (emphases added).  The Objectors interpret this language as supporting their position against estoppel, but it is more reasonably read to the contrary.  The specific language not only stated a position on the exact issue involved in this appeal, but also stated that this would be the Board's position until ordered to rule to the contrary by a higher authority.  It is well-established that "where a document contains both general and specific provisions relating to the same subject, the specific provision is controlling."  
Continental Casualty Co. v. Polk Bros., Inc.
, 120 Ill. App. 3d 395, 399, 457 N.E.2d 1271, 1274 (1983).  

Moreover, while the Guide's disclaimer directs candidates to consult counsel when preparing their nominating papers, this court has stated that "it would be a great injustice to penalize any candidate for failure to understand a provision in the Election Code which we ourselves have had considerable difficulty in interpreting."  
Merz
, 94 Ill. App. 3d at 1117, 419 N.E.2d at 632-33.  As noted above, in this case, the statute at issue is subject to several interpretations; competent legal counsel would have had no way of determining that the Guide was clearly wrong on this point.  Furthermore, before the SOEB, when the Candidates moved to strike the objections, the Objectors filed responses that cited the Guide as an authority.  In sum, the Candidates' reliance on the Guide was reasonable, given the facts and circumstances here.

Citing 
Lindahl v. City of Des Plaines
, 210 Ill. App. 3d 281, 568 N.E.2d 1306 (1991), the Objectors argue that a party seeking to estop the State must prove the fraudulent intent of the state body.  However,  
Lindahl
 cited 
Bank of Pawnee v. Joslin
, 166 Ill. App. 3d 927, 521 N.E.2d 1177 (1988), for this proposition; in turn, 
Joslin
 cited 
Lincolnland Properties, Inc. v. Butterworth Apartments, Inc
., 65 Ill. App. 3d 907, 912, 382 N.E.2d 1250, 1255 (1978), which states that fraudulent intent is not essential for recovery on a theory of estoppel.  Indeed, our supreme court has expressly stated that "[a] fraudulent intent is not necessary to estoppel."  
Cessna v. Montgomery
, 63 Ill. 2d 71, 86, 344 N.E.2d 447, 454 (1976).  Notably, one of the cases the 
Ceesna
 court cited in support of its statement was 
Trustees of Schools v. Village of Cahokia
, 357 Ill. 538, 543, 192 N.E. 565 (1934), a case involving public bodies.  Thus, in 
Merz
, this court applied the doctrine of estoppel, even though it was "obvious that in distributing the information sheets containing information which was incorrect under our reading of the statute, the clerk's intention was not to undermine the statutory scheme, but rather to perform a meaningful public service."  
Merz
, 94 Ill. App. 3d at 1117, 419 N.E.2d at 633.

Finally, we agree with the Objectors that reasonable limitations on ballot access are legitimate because they serve an important interest in maintaining the integrity of the ballot.  However, we also agree with the Candidates that ballot access is a substantial right that should not be lightly denied.  The ostensible limitation on ballot access in section 10-2 is ambiguous, particularly given the facts of this case; imposing the limitation in this case would be neither reasonable nor just.  Indeed, the Board's decision to bar the Candidates after issuing of a purportedly misleading determination on that exact issue (and included in the Guide precisely because the staff thought it likely to arise in this election) cannot be deemed a reasonable limitation on ballot access.

For all of the aforementioned reasons, the decision of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY and REID, JJ., concur.

FOOTNOTES
1:  The Board has not filed a brief in this appeal.

2:  This court's order, entered on September 19, 2002,  required the Objectors to submit their reply brief by October 7, 2002.  Although the Objectors did not file their reply until October 11, 2002, this court has read and considered the argument therein.