2024 IL App (1st) 232451

FOURTH DIVISION
November 27, 2024

No. 1-23-2451

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| A.A., a minor, by and through his next friend and parent, ELIZABETH PASILLAS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22 CH 10193 |
| BOARD OF EDUCATION, SUMMIT SCHOOL DISTRICT NO. 104, | ) ) ) | Honorable |
| Defendant-Appellant. | ) ) | Caroline Kate Moreland, Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Justice Lyle concurred in the judgment and opinion.
Justice Ocasio dissented, with opinion.

**OPINION**

¶ 1   The Board of Education ("the Board") of Summit School District No. 104 ("the District")

appeals a circuit court judgment granting a petition for a writ of *certiorari* filed by A.A., through

his mother, Elizabeth Pasillas, in which A.A. challenged the Board's decision to expel him from

school for one year for bringing a pellet gun to school. Because we disagree with the circuit court's

conclusion that the Board failed to comply with the requirements of the Illinois School Code

(School Code) (105 ILCS 5/10-22.6 (West 2022)), we reverse the court's judgment and affirm the Board's decision.

¶ 2     The facts of the case are not in dispute. The events leading to A.A.'s expulsion occurred on May 24, 2022, when A.A. was a 13-year-old student at Heritage Middle School ("Heritage"). While in the course of investigating drawings on the wall of a boys' bathroom, Heritage's Dean, Scott Forman, searched A.A.'s locker. Inside the locker was A.A.'s backpack, which contained a loaded pellet gun. The orange safety tip on the end of the barrel of the pellet gun had been painted black, and Forman initially believed it to have been a real firearm. Forman and Assistant Principal Laura Skowronek then met with A.A., who admitted that the gun was his and explained that he had obtained it from a friend. Skowronek then called Pasillas and informed her that they had found the gun in A.A.'s backpack. Skowronek completed a Suspension Notification form stating that A.A. was to be suspended from school for the remaining seven days of the school year for possessing a weapon and engaging in gang-like activities. The Suspension Notification also stated that "[A.A.'s] action of bringing and possessing a gun at school disrupted the school safety of all students[] and staff."

¶ 3     Several weeks later, the Board sent A.A.'s parents a Notice of Expulsion Hearing notifying them that the Heritage administration had recommended that A.A. be expelled from the school for one year and that a hearing on the matter would be held. In a section providing for a list of "additional efforts to resolve threats or disruptions and minimize the length of out-of-school suspensions," the notice listed only an "administrator conference with student."

¶ 4     At the expulsion hearing on July 22, 2022, the District's Director of Expulsion, Kathy Johnson, elaborated on the reference to an administrator conference and explained that it referred

to a meeting between A.A. and the Heritage administration on May 24, 2022, the day that the gun was found, during which they "talked about the situation." Johnson was also asked a statutory requirement that "all the behavioral and disciplinary interventions [had] been attempted" and whether "there are no other available interventions existing for A.A." In response, Johnson testified that there were other interventions that were not listed in the hearing notice, specifically a social worker giving lessons in the classroom and a school-wide talk given by the school resource officer regarding safety and violence in the community. Johnson noted that all of the students at Heritage had received those interventions. Because of those previous interventions, Johnson explained that "[f]or this specific incident, the rationale is that an administrative conference was appropriate." Johnson added, "because of the significance of the look-alike weapon and the concern that certainly causes, we believe that [the administrator conference] was the most appropriate intervention, and that is the exhaustion [of appropriate and available interventions] that we can give at this time."

¶ 5    Johnson was also asked about another statutory consideration, whether "A.A.'s continued presence in the school pose[s] a threat to the safety of others, staff or to the community." She answered:

> "Well, when we look at something like a weapon, that's how we think of it certainly because it's a weapon and it's concerning. We really made that decision, that was the day that Uvalde happened, and the concern certainly is the alarm and chaos and danger that it would cause, whether that would be physical or emotional damage to others, with someone who made a decision such as this (inaudible) within the school."

¶ 6  The District admitted into evidence A.A.'s disciplinary record, which contained 18 "referrals." These included four referrals for "not following directions," one for "excessive talking," eight for "disruptive behavior," one for "phone violation/ear buds," and four categorized simply as "other." Assistant Principal Skowronek explained that of those referrals, only the cell phone violation was considered "major," with the others being "minor."

¶ 7  A.A.'s mother, Pasillas, testified that A.A. had also received a previous in-school suspension for fighting with a friend, which she described as "play fighting, and maybe a little more rough than -- you know, they were just play fighting in the hallway." Pasillas opined that A.A. did not have any intentions of harming anyone when he brought the pellet gun to school, and she stated that he has never shown any aggressive behavior, other than the fighting for which he was suspended.

¶ 8   A.A. also testified at the hearing. He stated that the tip of the pellet gun was already black when he got it and that he did not paint it. He claimed that he did not pay for the gun and that a classmate gave it to him, after which he left it in his backpack. He never took it out or touched it because he "didn't feel like [he] should have touched it or done anything with it." A.A. stated that he never planned to use the pellet gun, that he was disappointed in himself, and that he knew that he should not have had the gun. A.A. testified that he was open to alternative interventions, including meeting with a counselor, following a behavior contract, or doing daily bag checks.

¶ 9   Following the hearing, the hearing officer wrote a report summarizing the testimony and making certain findings of fact. Within this report were written statements from Kathy Johnson addressing certain statutory considerations. Specifically, regarding the exhaustion of other appropriate interventions, Johnson stated that "[a]ll students received instruction on prohibited

items and behaviors at school, Officer Dominguez has spoken about safety and violence, and for this offense, the appropriate intervention is expulsion as determined by the administrative team." Addressing the effect of A.A.'s ongoing presence at school, Johnson stated, "[f]or someone to bring a weapon, even a look-alike weapon, into school poses a danger to both the physical and emotional well being of students and staff. Furthermore, the alarm and chaos resulting from a lookalike weapon of which students or staff became aware would disrupt and interfere with the operation of the school." The hearing officer opined in the report that the evidence supported a finding of guilt, but he did not recommend a punishment and instead left that responsibility to the Board.

¶ 10     The Board ultimately agreed with the school officials' recommendation and imposed a one-year expulsion. In an initial letter from Johnson to A.A.'s parents on August 3, 2022, Johnson stated simply that, "based upon possession of a pellet gun in violation of District 104 handbook policy 6.30," the Board had decided to expel A.A. for one year. After A.A. asked for additional explanation regarding the decision, the Board sent a second notice ("Expulsion Decision"), in which the Board explained that A.A.'s possession of the pellet gun on school grounds "amounts to gross misconduct and posed a danger, whether actual or perceived[,] and further threatened the health, safety, and/or wellbeing of any person in the community." The Board concluded, "given the magnitude of [A.A.'s] action, *** the need to maintain the health[,] safety, and well-being of the entire school community, and the need to maintain the effectiveness of the school's education programs, the Board considers expulsion for a term of one school calendar year as the only option."

¶ 11     In October 2022, A.A. filed a petition for writ of *certiorari* in the circuit court, asking for the Board's Expulsion Decision to be vacated. A.A. argued (1) that the District had not exhausted

all appropriate and available behavioral interventions before recommending expulsion, as required by section 10-22.6(b-20) of the School Code, and that the Board had effectively applied an impermissible zero-tolerance policy; (2) that the Board had not demonstrated that his continuing presence was a safety threat or was likely to cause a substantial disruption to school operations, as also required by section 10-22.6(b-20); and (3) that the Board's decision was an abuse of discretion based on the factors set forth in *Robinson v. Oak Park & River Forest High School*, 213 Ill. App. 3d 77 (1991) (identifying five factors to consider when evaluating whether a school board has abused its discretion in disciplining a student).

¶ 12    On November 27, 2023, the court entered a written order granting A.A.'s petition. The court began by noting that, although A.A. had already served his one-year expulsion by the time of the court's ruling, the matter was not moot because A.A. was also asking that the expulsion be expunged from his disciplinary record and the court could, therefore, grant him effectual relief. Turning to the merits of the action, the court agreed with A.A.'s first argument and found that the District had not exhausted all appropriate and available interventions and that the District had impermissibly applied a zero-tolerance policy. The court specifically found that the post-incident administrator conference was not an intervention, but rather "a step taken to effectuate the expulsion process," and that the other school-wide interventions that the District had cited had occurred prior to the May 2022 incident and were not "specific interventions regarding A.A.'s conduct." The court did not address A.A.'s second and third arguments regarding the threat posed by his continuing presence or the *Robinson* factors. This appeal follows.

¶ 13    A.A. sought review of the Board's Expulsion Decision by writ of *certiorari*, which is an available method of review when an enabling statute does not adopt the Administrative Review

Law (735 ILCS 5/3-101 *et seq.* (West 2022)) or otherwise provide a method for reviewing agency decisions. *Gwozdz v. Board of Education of Park Ridge-Niles School District No. 64*, 2021 IL App (1st) 200518, ¶ 29. "In this context, review of a writ of *certiorari* is 'essentially the same' as review of a petition to the circuit court filed under Administrative Review Law." *Id.* (quoting *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324, 337 (2009)). Accordingly, as in administrative appeals, this court reviews the decision of the Board, and not that of the circuit court. *Id.* (citing *Lindemulder v. Board of Trustees of the Naperville Firefighters' Pension Fund*, 408 Ill. App. 3d 494, 500 (2011)). An agency's findings of fact are considered *prima facie* true and will not be reversed on appeal unless they are against the manifest weight of the evidence. *Id.* "A factual determination is against the manifest weight of the evidence if the opposite conclusion is clearly evident." *Id.* (citing *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008)). An agency's ruling on questions of law, on the other hand, are reviewed *de novo*, and mixed questions of law and fact are reviewed under the clearly erroneous standard. *Preuter v. State Officers Electoral Board*, 334 Ill. App. 3d 979, 987 (2002) (citing *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998)). "A determination is clearly erroneous if the reviewing court 'is left with the definite and firm conviction that a mistake has been committed.' " *Gwozdz*, 2021 IL App (1st) 200518, ¶ 29 (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001)).

¶ 14    Before addressing the specific issues in this case, it is helpful to begin with the statute that is at the center of most of our discussion. Section 10-22.6 of the School Code contains procedures and substantive requirements for the suspension or expulsion of students from Illinois schools. As a starting point, subsection (b-5) states that, "[a]mong the many possible disciplinary interventions

and consequences available to school officials, school exclusions, such as out-of-school suspensions and expulsions, are the most serious." Accordingly, "[s]chool officials shall limit the number and duration of expulsions and suspensions to the greatest extent practicable, and it is recommended that they use them only for legitimate educational purposes." *Id.* Subsection (b-20) then sets forth the specific circumstances under which an expulsion is permissible. Specifically, it provides that expulsions may be used "only if other appropriate and available behavioral and disciplinary interventions have been exhausted and the student's continuing presence in school would either (i) pose a threat to the safety of other students, staff, or members of the school community or (ii) substantially disrupt, impede, or interfere with the operation of the school." The respective determinations of whether each of these requirements has been met shall be made by school officials on a case-by-case basis. *Id.*

¶ 15    In his challenge to his expulsion, A.A. contends that (1) the Board failed to exhaust all appropriate and available interventions, (2) the Board failed to show that his continuing presence at school would pose a safety threat or substantially disrupt school operations, and (3) the Board's decision to expel him for one year is otherwise an abuse of discretion based on the factors outlined in *Robinson*. The first two issues regarding whether the established facts of the case satisfy the statutory requirements of section 10-22.6(b-20) are mixed questions of law and fact, which we will review for clear error. See *Gwozdz*, 2021 IL App (1st) 200518, ¶ 31 (" 'A mixed question asks whether the facts satisfy the statutory standard or whether the rule of law as applied to the established facts is or is not violated.' " (quoting *Begg v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50)). The third issue is reviewed for abuse of discretion. See *Robinson*, 213 Ill. App. 3d at 82.

¶ 16 Guiding our review of these issues is the principle that the disciplining of students is generally not the province of courts and is a matter that is normally left to the sound discretion of school officials and school boards.

> "School discipline is an area which courts enter with great hesitation and reluctance and rightly so. School officials are trained and paid to determine what form of punishment best addresses a particular student's transgression. They are in a far better position than is a black-robed judge to decide what to do with a disobedient child at school. They can best determine, for instance, whether a suspension or an after-school detention will be more effective in correcting a student's behavior. Because of their expertise and their closeness to the situation and because we do not want them to fear court challenges to their every act school officials are given wide discretion in their disciplinary actions." *Donaldson v. Board of Education for Danville School District No. 118*, 98 Ill. App. 3d 438, 439 (1981).

¶ 17 In his first argument against the Board's Expulsion Decision, A.A. asserts that the Board failed to exhaust all appropriate and available interventions before resorting to expulsion. He points out that section 10-22.6(b-20) allows for expulsion "only if" other appropriate and available interventions have been exhausted, and he contends that school officials had several other intervention options available to them before resorting to expulsion, such as counseling, daily bag checks, or community service. He also argues that the interventions that the school officials said that he had received were not truly interventions because they occurred prior to the incident in question.

¶ 18 However, section 10-22.6(b-20) also provides that, in the written decision explaining the reasons for a student's expulsion, "it shall be documented whether other interventions were

attempted *or whether it was determined that there were no other appropriate and available intervention*s." (Emphasis added.) Thus, and as A.A. concedes, the School Code allows for the possibility that there are no appropriate interventions other than expulsion. In other words, just because there are other *available* interventions, like those that A.A. proposes, that does not mean that they must be attempted. Rather, school officials can permissibly make the determination that there are no other *appropriate* interventions other than expulsion, a decision that the statute and our caselaw have left in their discretion. See *id.*; *Donaldson*, 98 Ill. App. 3d at 439.

¶ 19   In this case, the school officials noted that A.A. had been instructed on school safety and prohibited items at school, and he knew that he was not allowed to bring a gun to school. Kathy Johnson explained in her testimony and in her written statement in the hearing officer's report that, because A.A. had received that instruction, there were no other appropriate and available interventions to address the possession of a lookalike gun at school. In the school officials' view, instruction was the appropriate intervention to prevent a student from bringing a weapon to school, and A.A. had already received that instruction. Therefore, according to the officials, the appropriate interventions had been exhausted. This was a determination that was within the school officials' discretion, and we cannot say that their determination on this issue was clearly erroneous. Rather, their view of the issue was reasonable, and A.A.'s proposed alternatives do not appear to be so evidently more appropriate as to demonstrate clear error on the part of the school officials. Keeping in mind their broad discretion to handle disciplinary matters, school officials did not clearly err in determining that appropriate and available interventions had been exhausted.

¶ 20   As a secondary component of his argument on this issue, A.A. also asserts that his expulsion in lieu of other interventions amounted to a *de facto* zero-tolerance policy, which is

prohibited by section 10-22.6(b-10). However, the language of the School Code does not support his argument. Section 10-22.6(b-10) provides that "school boards may not institute zero-tolerance policies by which school administrators are required to suspend or expel students for particular behaviors." Thus, the statute prohibits a school board from instituting a policy requiring a particular form of discipline for a particular offense, with the concern seemingly being the removal of discretion and the requirement of a certain outcome. But there is no suggestion that the Board had instituted any particular policy in this case or that expulsion was a mandated sanction. To the contrary, the record reflects that the school officials exercised discretion in recommending expulsion to the Board, which then agreed with their recommendation. Accordingly, A.A.'s argument on this point is without merit.

¶ 21    In his second argument against the Board's Expulsion Decision, A.A. contends that the record does not support a determination that his continuing presence at school would present a safety threat or substantially disrupt school operations, as is required by section 10-22.6(b-20). He argues that certain past-tense or "backward-looking" language in the Board's Expulsion Decision demonstrates that it considered only the effects of his past actions, rather than properly considering the effect of his future "continuing presence" at school, and he further argues that the facts otherwise did not support a finding that his presence at school would pose a safety threat or disrupt the operations of the school. We do not see clear error on either point.

¶ 22  First, A.A. is incorrect to focus on the language used by the Board in its Expulsion Decision. While it is true that the Board used the past tense when stating that A.A.'s possession of the pellet gun on school grounds "amounts to gross misconduct and posed a danger, whether actual or perceived[,] and further threatened the health, safety, and/or wellbeing of any person in the

community," it was not the Board that was responsible for making that determination. Rather, section 10-22.6(b-20) states that whether a student's ongoing presence poses a safety threat or would impede the operation of the school "shall be determined on a case-by-case basis *by school officials*." (Emphasis added.) Therefore, it is the statements and reasoning of the school officials that are the relevant considerations in this issue.

¶ 23  When we look at the statements of school officials, we see indications that they were properly conducting a forward-looking analysis. Specifically, the District's Director of Expulsion, Kathy Johnson, testified at the expulsion hearing that, "the concern certainly is the alarm and chaos and danger that [a weapon on school grounds] *would cause*, whether that would be physical or emotional damage to others, with someone who made a decision such as this (inaudible) within the school." (Emphasis added.) She also stated in the hearing officer's report, "[f]or someone to bring a weapon, even a look-alike weapon, into school poses a danger to both the physical and emotional well being of students and staff. Furthermore, the alarm and chaos resulting from a lookalike weapon of which students or staff became aware *would* disrupt and interfere with the operation of the school." In both statements, Johnson used the word "would," which is forward-looking language, and she appears to have been focused on (1) the potential effect of A.A. again bringing a weapon to school and (2) the effect that the presence of someone who previously brought a lookalike gun to school would have on other students. So, while A.A. contends that his expulsion was improperly a punishment for past action, rather than a preventative measure to protect against future safety threats or school disruption, the record reflects that school officials were properly considering the effects of his future and ongoing presence in school.

¶ 24 Second, we do not see clear error in the school officials' determination that A.A.'s continuing presence would either pose a safety threat or substantially disrupt the operation of the school. A.A. argues that school officials improperly cited national school shooting episodes as a factor in the expulsion decision, and he points out that he testified without contradiction that he never intended or threatened to use the weapon, that he knew that his possession of the pellet gun was wrong, and that he was willing to cooperate with disciplinary measures such as daily bag checks or community service.

¶ 25 However, it is entirely reasonable for the school officials to have taken the national school shooting landscape into consideration when deciding A.A.'s discipline. One of the determinations that the officials had to make under subsection (b-20) was whether A.A.'s ongoing presence would "substantially disrupt, impede, or interfere with the operation of the school." That analysis would logically include a consideration of the effect of A.A.'s presence on his classmates and their educational environment. Given the prevalence of school shootings in this country, it would be natural for A.A.'s fellow students to be wary and concerned about the presence of someone who brought a lookalike gun to school. Indeed, this seemed to be a chief concern of Johnson, who testified that "the concern certainly is the alarm and chaos and danger that [a weapon on school grounds] would cause, whether that would be physical or emotional damage to others, *with someone who made a decision such as this (inaudible) within the school*." (Emphasis added.) Although part of her statement was inaudible, it seems clear from the context that Johnson was thinking about how other students would be affected by the mere presence of someone who brought a lookalike gun to school. That is certainly a reasonable concern when evaluating whether

A.A.'s ongoing presence would substantially disrupt, impede, or interfere with the operation of the school.

¶ 26    Even though it is true that A.A. testified without contradiction or impeachment that he had not threatened to use the pellet gun, had no intention of using the gun, and had not even touched the gun since it was placed in his bag by a classmate, we cannot fault the school officials' apparent decision to focus on how other students would be affected by A.A.'s presence after he was found with a lookalike gun at school. That is a reasonable consideration, and, again considering their broad discretion in these matters, the school officials' determination that A.A.'s continuing presence would substantially interfere with the operation of the school was not clearly erroneous.

¶ 27    A.A.'s final argument concerns the five factors outlined in *Robinson v. Oak Park & River Forest High School*, 213 Ill. App. 3d 77 (1991), for the evaluation of a school board's disciplinary ruling. In that case, this court recognized that, "[a]lthough officials have broad discretion in the area of student discipline \*\*\*, the Board's discretion has limits." *Id.* at 82. Our court, therefore, set forth five factors to consider when reviewing whether a school board has abused its discretion in disciplining a student: "(1) the egregiousness of the student's conduct; (2) the history or record of the student's past conduct; (3) the likelihood that such conduct will affect the delivery of educational services to other children; (4) severity of the punishment; and (5) the interest of the child." *Id.* However, given the rarity of court intervention in matters of school discipline, our research reveals only two reported decisions applying these factors. See *Wilson ex rel. Geiger v. Hinsdale Elementary School District 181*, 349 Ill. App. 3d 243, 249 (2004); *Kelly v. Board of Education of McHenry Community High School District 156*, 06 C 1512, 2007 WL 114300, at \*4 (N.D. Ill. Jan. 10, 2007).

¶ 28 A.A. and the Board each argue that these factors support their respective positions. But before we conduct that analysis, we observe an issue that neither party has addressed, which is that the legislature's recent amendment of the School Code has effectively obviated the need to look to the *Robinson* factors when evaluating the propriety of a school board's disciplinary action. Indeed, the School Code that exists today is markedly different than it was at the time that *Robinson* was decided. When the *Robinson* factors were devised, section 10-22.6 of the School Code did not contain subsection (b-20) and its substantive requirements for the expulsion of a student. Prior to the addition of subsection (b-20) as part of a substantial overhaul of the statute in 2015 by Public Act 99-456 (eff. Sept. 15, 2016) (amending 105 ILCS 5/10-22.6), and continuing back to the time that *Robinson* was decided, the only substantive guidance that section 10-22.6 provided regarding the grounds for expulsion were that a student could be expelled for "gross disobedience or misconduct" (see 105 ILCS 5/10-22.6(a) (West 2014)) or for the possession of certain specified weapons on school grounds or at school-related activities (see *id.* § 10-22.6(d)). The statute did not define "gross disobedience" or "misconduct," and it did not provide any additional requirements or criteria that must be satisfied for a student to be expelled. In other words, the requirements for the expulsion of a student were highly nebulous, necessitating the additional analytical framework outlined in *Robinson*.

¶ 29 In contrast, the modern School Code provides specific standards that must be met before a student can be expelled, namely, as we have discussed above, that "other appropriate and available behavioral and disciplinary interventions have been exhausted" and that "the student's continuing presence in school would either (i) pose a threat to the safety of other students, staff, or members of the school community or (ii) substantially disrupt, impede, or interfere with the operation of the

school." 105 ILCS 5/10-22.6(b-20) (West 2022). The new substantive standards of subsection (b-20) obviate the need to consider the factors set forth in *Robinson*, as we now have specific criteria to examine when evaluating the propriety of a school board's decision to expel a student, and those criteria appear to largely incorporate the considerations identified in *Robinson*. In particular, the exhaustion of other appropriate and available interventions seems to encompass the first, second, fourth, and fifth *Robinson* factors, as the analysis of whether school officials could and should have chosen a lesser intervention naturally includes the consideration of the seriousness of the student's conduct, the student's history, the best interests of the student, and the severity of the chosen sanction. Further, the consideration of the effect of the student's ongoing presence addresses the third factor, which is how the student's conduct affects the delivery of educational services. Accordingly, we conclude that the *Robinson* factors are largely duplicative of the new criteria set forth in subsection (b-20) and no longer need to be considered when evaluating whether a school board's disciplining of a student should be vacated.

¶ 30 As further evidence of the redundancy of the *Robinson* factors, we note that, if we were to apply them to the present case, our view of the propriety of the Board's ruling would not change and we would still see no abuse of discretion in Board's decision to expel A.A. First, he committed a serious offense by bringing a lookalike gun to school in knowing violation of school rules. Second, he had a lengthy disciplinary history that, while comprised of largely minor infractions, suggested a consistent refusal to follows rules and respect authority. Third, A.A.'s decision to bring a lookalike gun could reasonably cause fellow students to be fearful of his ongoing presence at school, thereby affecting the delivery of education services. Fourth, the Board's selection of a one-year expulsion is a severe sanction. While not the harshest punishment available, which would

have been a two-year expulsion, the legislature has cautioned that removing a student from his established learning environment is to be avoided if at all possible. And finally, for that same reason, expulsion would not be in A.A.'s best interests. When we consider these factors as a whole, we do not see an abuse of discretion. While it is true that A.A.'s history has been non-violent, with the exception of what his mother characterized as "play fighting" with a friend, and that A.A. obviously would not benefit from being expelled from school, the Board and school officials have a duty to provide a safe and effective learning environment for all students. See *People v. Dilworth*, 169 Ill. 2d 195, 212 (1996) (" 'The state, having compelled students to attend school and thus associate with the criminal few—or perhaps merely the immature and unwise few—closely and daily, thereby owes those students a safe and secure environment.' " (quoting 4 W. LaFave, Search & Seizure § 10.11(a), at 802-06 (3d ed. 1996)). This consideration was evident in its Expulsion Decision, in which it stated that A.A.'s expulsion was necessary due to "the need to maintain the health[,] safety, and well-being of the entire school community, and the need to maintain the effectiveness of the school's education programs." This concern that school officials raised regarding the effect of A.A.'s ongoing presence on the educational environment is legitimate and reasonable. Accordingly, we cannot say that the Board's decision to expel A.A. for one year to serve those interests was an abuse of discretion.

¶ 31 For the foregoing reasons, we reverse the judgment of the circuit court and affirm the decision of the Board.

¶ 32    Circuit court judgment reversed. Board decision affirmed.

¶ 33    JUSTICE OCASIO, dissenting:

¶ 34    On May 24, 2022, the same day that a mass shooter murdered 19 fourth-graders and two teachers at an elementary school in Uvalde, Texas, the dean of academics and discipline at Heritage Middle School in Summit, Illinois, searched a locker assigned to A.A., a sixth-grader suspected of committing an act of vandalism in the boys' bathroom. The dean thought that he would find a paint pen. But when he opened the locker, he saw a black handgun in an open pocket in A.A.'s backpack. He showed it to the school's assigned police officer, who determined that the gun was actually just a pellet gun—dangerous, yes, but not deadly in the way a firearm is. That distinction was an important one. Consistent with state law, district policy mandated a one- to two-year expulsion for possession of a firearm. See 105 ILCS 5/10-22.6(d)(1) (West 2024). Although still an extremely serious violation of the district's student-conduct policies, A.A.'s possession of a pellet gun did not trigger a mandatory expulsion because he had not tried to use it to hurt anybody. See *id.* § 110-22.6(d)(2). In the end, though, it made no difference. The suspension notice that the school gave to A.A.'s mother that afternoon stated that his return date was "[t]o be determined." What was implicit in the suspension notice was made explicit a few weeks later, when the district scheduled an expulsion hearing, and the Board ultimately expelled A.A. for the following academic year. The question presented in this case is whether the Board acted within the confines of its authority to expel students under section 10-22.6 of the School Code (105 ILCS 5/10-22.6 (West 2024)). The majority finds that it did. I do not agree.

¶ 35    For too long, Illinois schools were too quick to impose a punishment that was too extreme: expulsion. Efforts to change that came to fruition with the enactment of Public Act 99-456 (eff. Sep. 15, 2016), which added several new provisions to section 10-22.6 of the School Code (105 ILCS 5/10-22.6 (West 2016)). One of those provisions articulated the purpose of these reforms:

"Among the many possible disciplinary interventions and consequences available to school officials, school exclusions, such as out-of-school suspensions and expulsions, are the most serious. School officials shall limit the number and duration of expulsions and suspensions to the greatest extent practicable, and it is recommended that they use them only for legitimate educational purposes. To ensure that students are not excluded from school unnecessarily, it is recommended that school officials consider forms of non-exclusionary discipline prior to using out-of-school suspensions or expulsions." *Id.* § 10-22.6(b-5).

¶ 36     Public Act 99-456 did not take expulsion off the table entirely, but it significantly curtailed school officials' hitherto-unfettered discretion to use expulsion as a disciplinary tool. Before expelling a student, two criteria must be satisfied. First, "expulsions *** may be used only if other appropriate and available behavior and disciplinary interventions have been exhausted." *Id.* § 10-22.6(b-20). Second, the needs of the school must require the student's long-term exclusion from the school insofar as "the student's continuing presence in school would either (i) pose a threat to the safety of other students, staff, or members of the school community or (ii) substantially disrupt, impede, or interfere with the operation of the school." *Id.* As to this second criteria, the school must "make all reasonable efforts to resolve such threats, address such disruptions, and minimize the length of student exclusions to the greatest extent practicable." *Id.*

¶ 37     To ensure that school officials exercise their discretion within these statutory boundaries before expelling a student, section 10-22.6 also requires school boards to issue a "written expulsion decision" justifying its determination that the substantive criteria have been met. *Id.* § 10-22.6(a). The written decision must show compliance with the exhaustion requirement by "document[ing] whether other interventions were attempted or whether it was determined that there were no other appropriate and available interventions." *Id.* § 10-22.6(b-20). It must explain why the needs of the school require

expulsion by "detail[ing] the specific reasons why removing the pupil from the learning environment is in the best interest of the school." *Id.* § 10-22.6(a). And it must "include a rationale as to the specific duration of the expulsion." *Id.*

¶ 38    Traditionally, review of school disciplinary decisions in Illinois has been exceedingly deferential. Discipline at school is "an area which courts enter with great hesitation and reluctance." *Donaldson v. Board of Education for Danville School District No. 118*, 98 Ill. App. 3d 438, 439 (1981). Courts assume, not unreasonably, that school officials are better at deciding "what to do with a disobedient child at school." *Id.* Hence, courts have only overturned suspensions or expulsions that are "arbitrary, unreasonable, capricious, or oppressive." *Id.* Public Act 99-456 did not alter that deference; in fact, it expressly placed the responsibility for making its required determinations in the hands of "school officials." See 105 ILCS 5/10-22.6(b-20) (West 2024). As noted, however, the statute substantially circumscribes the discretion of school officials to expel students. The role of the courts is to ensure that expulsion decisions are made within the framework provided by the statute.

¶ 39    The question, then, is whether the Board's determination that the criteria for expulsion were satisfied in this case was arbitrary, unreasonable, capricious, or oppressive. To answer that question, we must examine the reasons underlying the Board's determination, which are set out in the report of the expulsion-hearing officer:

> "*1. The specific reason why expelling the student is in the best interest of the school.*
>
> Answer: The possession of a look-alike gun at school. It was modified to look like a real gun to anyone unfamiliar with guns.
>
> *2. The rationale for the duration of the expulsion.*
>
> Answer: Again, the possession of a look-alike gun modified to resemble a real weapon, the fact that members of the staff who saw the gun thought that it was real, the incidence of

school shootings around the country, and the concern for events in this and other nearby communities.

> *3. How all behavioral and disciplinary interventions were attempted or how no other appropriate and available interventions existed for the student.*

> Answer: All students received instruction on prohibited items and behaviors at school, Officer Dominguez has spoken about safety and violence, and for this offense, the appropriate intervention is expulsion as determined by the administrative team.

> *4. How the student's continuing presence in school poses a threat to the safety of other students, staff, or members of the school community, or substantially disrupts, impedes, or interferes with the operation of the school.*

> Answer: For someone to bring a weapon, even a look-alike weapon, into school poses a danger to both the physical and emotional well being of students and staff. Furthermore, the alarm and chaos resulting from a lookalike weapon of which students or staff became aware would disrupt and interfere with the operation of the school." (Italics added for clarity.)

When considered in light of the record, these justifications do not adequately support the Board's ultimate determinations that both criteria for expulsion were satisfied.

¶ 40    First, the record does not reasonably support a determination that all "other appropriate and available behavior and disciplinary interventions [were] exhausted" before deciding to expel A.A. *Id.* § 10-22.6(b-20). The Board's stated justification is not sufficient. Essentially, the Board's position is that, when it comes to bringing pellet guns to school, the only appropriate intervention short of expulsion is to tell students not to bring pellet guns to school. That is a zero-tolerance policy in fact, if not in name, and it is contrary to the plain legislative intent to limit mandatory expulsions to students who either possess a firearm or use some other kind of weapon. See *id.* § 10-22.6(b-10) (prohibiting

school boards from mandating suspension or expulsion for certain behaviors except as required by law); *id.* § 10-22.6(d) (mandating expulsion for firearm possession or weapon use). The statute should not be interpreted to vest school officials with discretion to informally apply zero-tolerance policies that would be contrary to law if formally adopted by the school board.

¶ 41   On a more fundamental level, the obvious purpose of the exhaustion requirement is to ensure that, before expelling a student, school officials consider the alternatives. The statute stops just short of mandating such consideration in every case by "recommend[ing] that school officials consider forms of non-exclusionary discipline prior to using out-of-school suspensions or expulsions," not requiring it. *Id.* § 10-22.6(b-5). Nevertheless, the statute anticipates that school officials will exercise their judgment in deciding whether "other appropriate and available *** interventions have been exhausted," and I do not see how, in this case, one could make a considered judgment without considering what those alternatives might be. The administrative record in this case simply does not show that school officials considered any "intervention" short of expelling A.A. Kathy Johnson, the district's director of expulsions, testified that, before sending the expulsion notice, she had a conference with the school administration and the district superintendent, after which "[t]he recommendation of the team was a one-year expulsion." But she also explained that her role is simply to act on the recommendation from the school administration, whatever it may be.[1] When specifically asked by counsel for the Board about other available interventions, she did not identify even *one* responsive intervention that the various administrators in attendance considered.

---

[1] Johnson described her role as director of expulsion as follows: "My duty is to gather or accept the information from the administrators, and from that point based on that—the recommendation of the building administration, if it is a recommendation to move forward to expulsion, I contact the parent and I set up the expulsion hearing." She also testified that she collects various documentation, such as the student's disciplinary record, the underlying disciplinary notice, and an incident report, which must be written and given to her if it does not already exist.

¶ 42    Second, even if the record did show that the Board considered lesser interventions rather than jumping straight to expulsion, exhaustion is only a necessary condition, not a sufficient one. Section 10-22.6(b-20) makes it clear that expulsion cannot be used purely as a disciplinary tool. It is only permitted when the needs of the school require the student's exclusion for one of the two reasons identified in the statute. And the record does not support the Board's determination that A.A.'s presence in the school would pose a safety threat or disruption to the school that could not be resolved or addressed through reasonable measures. Through Johnson, the Board justified that determination based on the problems that could arise if A.A. brought a pellet gun to school again:

> "For someone to bring a weapon, even a look-alike weapon, into school poses a danger to both the physical and emotional well being of students and staff. Furthermore, the alarm and chaos resulting from a look-alike weapon of which students or staff became aware would disrupt and interfere with the operation of the school."

These are reasonable concerns, but there is no indication in the record that they cannot be resolved though some reasonable means short of expulsion. The statute is unambiguous: "School officials shall make all reasonable efforts to resolve such threats, address such disruptions, and minimize the length of student exclusions to the greatest extent practicable." 105 ILCS 5/10-22.6(b-20) (West 2024). At the expulsion hearing, counsel for A.A. suggested that any concern that A.A. would bring a pellet gun to school again could "be mitigated with a safety plan, a behavior contract, and *** daily bag checks." I am at a loss to understand why these would not be "reasonable efforts" short of expulsion that could have been taken to resolve any safety concerns or address the risk of disruption.

¶ 43    Because the administrative record does not reasonably support the Board's determination that the criteria for expulsion set forth in section 10-22.6(b-20) were satisfied, it acted outside its lawful authority when it expelled A.A. I do not arrive at this conclusion lightly. A.A.'s conduct—bringing a

pellet gun to school multiple times—is extremely serious, both as a matter of behavioral discipline and school safety. It appears that, when the pellet gun was discovered, the administration at Heritage Middle School and District No. 104 responded quickly and decisively to ensure the safety of students. A.A. does not appear to challenge his initial suspension, which would seem to be justified as a safety precaution to provide officials with the time and space to make a considered judgment about how to proceed. The problem here is that the administrative record fails to reflect any deliberation or consideration of alternatives beyond that initial response. Instead, with the horror of Uvalde fresh in everyone's mind, it appears that school officials simply applied an informal zero-tolerance policy. If school boards had plenary discretion in disciplinary matters, I would be hard-pressed to deem that unreasonable, but section 10-22.6(b-20) unambiguously limits the use of expulsion to situations where no lesser disciplinary measure would be appropriate and where the student's exclusion from school is not merely advantageous but *necessary* to ensure that the school provides a safe environment that is conducive to learning. The circumstances disclosed by the record here do not reasonably justify a determination that either criterion is satisfied here. I respectfully dissent.

No. 1-23-2451

Elizabeth Pasillas v. Board of Education, Summit School District No. 104
2024 IL App (1st) 232451

_____

Appeal from the Circuit Court of Cook County,
No. 22 CH 10193, Honorable Caroline Kate Moreland, Judge Presiding

_____

Appellant:     Leslie Quade Kennedy
               Odelson, Murphey, Frazier &McGrath, Ltd.
               3318 W 95th Street
               Evergreen Park, IL 60805
               Phone: (708) 424-5678

Appellee:      Ashley Fretthold, Ben Bennett, Hannah Berkowitz
               Legal Aid Chicago
               Attorneys for A.A.
               120 S. LaSalle Street, Suite 900
               Chicago, Illinois 60603
               Phone:  312-229-6312